UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------X

MERCY WELLINGTON, Case No. 24 cv 8743

*Plaintiff,*

-against- **AMENDED COMPLAINT**

THE CITY OF NEW YORK; New York City Police Department (NYPD); LT. DARRYL E. FONTAINE (Tax ID 937820); POLICE OFFICER RAWSAN A. JACKSON (Shield No. 26636); POLICE OFFICER KYLE M. LAGUARDIA (Shield No. 6801); POLICE OFFICER KELVIN VILLEGASALMAZO (Shield No. 7782); POLICE OFFICER RUSTAM MUKHUTDINOV (Shield No. 11823); PERRY PERLMUTTER, President and CEO of Services for the Underserved (S:US); ANGELA MORTIMER, Program Director at Harmonia S:US, individually and in their official capacities; LYNN GORE, Administrative Assistant at Harmonia S:US, individually and in their official capacities; <u>Jury Trial Demanded</u>

*Defendants.*

---------------------------------------------------------------------------X

RECEIVED SDNY PRO SE OFFICE 2025 JUL -9 AM 10:

Plaintiff, MERCY WELLINGTON, pro-se for her Amended Complaint alleges as follows:

## <u>NATURE OF ACTION</u>

1. Plaintiff Mercy Wellington, Pro-Se, brings this seemingly expansive action against private individuals, agencies, and New York City employees.

2. This is action at law to redress the deprivation of rights secured to Plaintiff under color of statute, ordinance, regulation, custom, and deprivation of rights, privileges, and immunities secured to the Plaintiff by the Fourth and Fourteenth Amendment to the Constitution of the United States, the Fair Housing Act, New York City Human Rights Laws, by the Title 42 U.S.C §§ 1983 and 1983, and further arising under the law and statutes of the State of New York.

3. Plaintiff in furtherance of her causes of action brought under New York State law filed a timely Notice of Claim against the City of New York in compliance with the Municipal Law Section 50 and in accordance with New York State law.

4. Plaintiff General Municipal Law § 50-h hearing is scheduled for June 26, 2025.

## JURISDICTION AND VENUE

5. The jurisdiction of this Court is invoked under 28 U.S.C. § 1343, this being an action authorized by law to redress the deprivation of rights secured under color of state law, statute, ordinance, regulation, custom, privileges, and immunities secured to the Plaintiff by the Fourth and Fourteenth Amendment to the Constitution of the United States. Jurisdiction of this Court exists under Plaintiff's Fourth and Fourteenth Amendment claims pursuant to 42 U.S.C. §§ 1983 and 1988.

6. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear state law causes of action.

7. Plaintiffs is seeking declaratory relief pursuant to 28 U.S.C. § 2201 et seq.

8. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 (b). The Southern District of New York is the judicial district where the shelter and arrest in questioning is located, where Defendants have a principal place of business, work, and where the facts giving rise to the instant claims occurred.

## JURY DEMAND

9. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

## PARTIES

10. Plaintiff Mercy Wellington is a 54-year-old domestic violence survivor at all times relevant was a resident of New York.

11. At all times hereinafter mentioned, Defendant, THE CITY OF NEW YORK (hereinafter "CITY") was and still is a municipal corporation organized and duly existing under and pursuant to the laws of the State of New York.

12. At all times relevant hereto, CITY and New York Police Department (hereinafter "NYPD"), was responsible for the policy, practice, supervision, implementation, and conduct of the CITY and NYPD matters, including the appointment, training, supervision, retention, control, and conduct of all CITY and NYPD personnel. In addition, at all times relevant, the CITY was responsible for enforcing the rules of CITY and NYPD and for ensuring that CITY and NYPD personnel obey the laws of the United States, State of New York, and the City of New York.

13. Defendant CITY has as the mission of fighting poverty and income inequality by providing New Yorkers in need with essential benefits such as food assistance, medical assistance, emergency rental assistance, quality and affordable housing.

14. Defendant CITY have as their mission the promotion of quality housing and diverse neighborhoods. CITY accomplishes this mission through loan and development programs for new affordable housing, preserves the affordability of existing housing stock, and enforces housing quality standards.

15. Defendant, Perry Perlmutter, is the President and CEO for Underserved (hereinafter "S:US").

16. Defendant, New York City Police Department (hereinafter "NYPD") was and still is a subdivision subject to the control of the City.

17. Upon information and belief, NYPD is a division of the CITY organized and existing under and by virtue of the laws of the CITY and the State of New York.

18. Defendant CITY is responsible for the policies, practices and customs of NYPD.

19. Defendant, Police Lieutenant Darryl E. Fontaine, Tax ID #937820, (hereinafter "Fontaine") was at all relevant times, a police officer of the New York City Police Department, acting in the capacity of agent, servant, employee of the City, and acting within the scope of his employment and under color of state law.

20. Defendant, Police Officer Rawsan A. Jackson, Shied No. 26636, (hereinafter "Jackson") was at all relevant times, a police officer of the New York City Police Department, acting in the capacity of agent, servant, employee of the City, and acting within the scope of his employment and under color of state law.

21. Defendant, Police Officer Kyle M. Laguardia, Shield No. 6801, (hereinafter "Laguardia") was at all relevant times, a police officer of the New York City Police Department, acting in the capacity of agent, servant, employee of the City, and acting within the scope of his employment and under color of state law.

22. Defendant, Police Officer Kelvin Villegasalmazo, Shield No. 7782, (hereinafter "Villegasalmazo") was at all relevant times, a police officer of the New York City Police Department, acting in the capacity of agent, servant, employee of the City, and acting within the scope of his employment and under color of state law.

23. Defendant, Police Officer Rustam Mukhutdinov, Shield No. 11823 (hereinafter "Mukhutdinov") were at all relevant times, police officers of the New York City Police Department, acting in the capacity of agent, servant, employee of the City, and acting within the scope of his employment and under color of state law.

24. At all times hereinafter mentioned, Defendants Police Officers, Fontaine, Jackson. Laguardia, Villegasalmazo, are being sued individually and in their official capacities.

## FACTUAL ALLEGATIONS

25. On or about August 12, 2023, Plaintiff still lived in a homeless shelter with her three children. The shelter was provided through DHS (herein the "CITY"). Since August 14, 2022, Plaintiff resided at Harmonia adult shelter run by Services for the Underserved (S:US), located at 12 East 31st Street, New York, NY 10016.

26. On or about August 12, 2023, at approximately 10:00 a.m., a staff member working at the shelter knocked on the unit door and informed Plaintiff that the program director logged her out of the shelter because Plaintiff has not signed the Night sheet for the past few nights. Plaintiff was told that she had 1 hour to pack her belongings and return to AFLIC (Adult Family Intake Center).

27. Plaintiff then went downstairs after being told about the logged out ("eviction") and spoke to Defendant Lynn Gore, the Administrative Assistant at Harmonia in her office, who provided her with an email from Jameel Morad at DHS (herein the "CITY") showing that she was logged out as per their requested. A response was received from him confirming the request (see **Exhibit "F"** for more details).

28. The email was dated August 10, 2023 at 3:29 p.m. from Defendant Lynn Gore requesting that Plaintiff and her family be logged out. At 3:34 p.m. a response from Jameel Morad from DHS ("herein the "CITY") stating "done," without following the rules and regulations guidelines for involuntary discharge for homeless family (see **Exhibit "F"**).

29. Once Plaintiff received a copy of such emails, she contacted Jameel Morad from DHS (herein the "CITY") by telephone and every other DHS staff that was attached in the email. Jameel

Morad informed Plaintiff that he was not aware of any logged-out requests regarding her and her family and asked who provided her with such document.

30. After speaking to Jameel Morad and learning he has no knowledge of such logout request, on or about August 12, 2023, Plaintiff contacted Councilman Keith Powers to request for help regarding the possible log out ("eviction"). Councilman Keith Powers then informed Plaintiff that he would contact DHS (herein the "CITY"). Plaintiff and her family was allowed to stay.

31. Once Plaintiff was informed that she could stay the night, she felt safe enough to leave the premises without fear of being locked out or unable to re-enter. Plaintiff then went to Midtown Precinct South to make a complaint regarding the harassment of the staff members at Harmonia adult shelter. While waiting to file the harassment complaint, Plaintiff took that opportunity to speak to a Lieutenant on duty to verify if they are allowed to enter the shelter and arrest her for trespassing since that was what staff members at Harmonia was threatening to do to her and her family if she did not leave the premises on her own. Plaintiff also took the email to PATH, (Prevention Assistance and temporary Housing). The worker asked Plaintiff who gave her the email and told Plaintiff that her case was active.

32. On or about August 14, 2023, Plaintiff was harassed again by shelter staff telling her that she needs to leave the premises. Staff members knocked on her door, and after she opened her door the staff members placed their feet in the door with trash bags in their hands telling her that she needed to pack her belongings.

33. They left Plaintiff's door after she refused to leave. After the staff members left Plaintiff called the police to inform them, she was being harassed again by the staff members of Harmonia (after she filed a harassment complaint). She requested police officers to come to the shelter to help deal with this matter. Officers never showed up to her unit, but Plaintiff later found out from

a security guard working for Harmonia that the officers did show up to the building. The security guard let Plaintiff know that the officers spoke to the staff workers there and informed them that they are unable to go upstairs to Plaintiff unit and remove her. Officers left after informing staff members at Harmonia with that information.

34. Plaintiff then spoke to Defendant Lynn Gore again in her office about why staff members are coming to her door to inform her she has to leave. Defendant Lynn Gore provided Plaintiff with an email from Nelly Vazquez stating she was logged out (see **Exhibit "I"**). Defendant Lynn Gore then made a remark about how she was told to stay out of this matter, that the was a situation between Plaintiff and other staff members. Plaintiff decided to not deal with Defendant Lynn Gore but waited to speak with Defendant Angela Mortimer the following day.

35. Plaintiff took the email and went back to her unit and email Nelly Vazquez from DHS (herein the "CITY") regarding the logout. Nelly Vazquez responded that Plaintiff needs to return back to AFIC as she was logged at (see **Exhibit "G"**).

36. On or about August 15, 2023, Plaintiff responded back Nelly Vazquez requesting that she be provided with proper documentation as is provided by DSS (herein the "CITY") for Rules and Regulations regarding logout (see **Exhibit "G"**). Nelly Vazquez did not respond to such a request or the email itself.

37. On or about August 15, 2023, at approximately 9:00 A.M. at 12 East 31st Street, New York, NY 10016, Plaintiff went downstairs to speak with Defendant Angela Mortimer, the Program Director in her office regarding the log out ("eviction"). Plaintiff asked Defendant why she was being logged out ("evicted"), and Defendant informed her that there was a big meeting and the bosses were coming down on her because they weren't getting any payment for Plaintiff and her children to reside there. Defendant then ask Plaintiff to do her a favor by signing the night sheet,

but Plaintiff said no. Plaintiff reminded her of the agreement they had regarding her having a DHS (herein the "CITY") conference about why she wasn't signing the Night Sheet. Plaintiff reminded Defendant one reason for not signing the Night Sheet was because she worked most night, and the second reason was because she requested a DHS case conference for failing to place her and her family in the proper shelter after WIN (Women In Need- **Exhibit "K"**) evicted her and her family leading to their placement at Harmonia (see **Exhibit "C"** for more details).

38. On or about August 15, 2023, at approximately10:00 A.M. at 12 East 31st Street, New York, NY 10016, while Plaintiff was talking to Defendant Angela Mortimer, NYPD arrived on the scene.

39. Defendant police officers Kyle M. Laguardia, Kelvin Villegasalmazo, and Rustam Mukhutdinov were the officers who first arrived on the scene. The officers entered the building and came straight to Defendant Angela Mortimer office. While in Defendant Angela Mortimer's office, one of the officers stated that they were called to which Defendant Angela Mortimer responded, this is the who we called about being logged out and refusing to leave, pointing at Plaintiff.

40. The officer took Plaintiff out into the corridor to ask for her version of the incident, to which Plaintiff explained that Defendant Angela Mortimer agreed upon her entering the shelter that Plaintiff can stay and do not sign the Night Sheet until she had a DHS conference.

41. In the meantime, upon Plaintiff's request, the other two officers on the scene started researching the proper procedures required on governing DHS Logouts.

42. While in the corridor, Defendant Angela Mortimer and other staff members of Harmonia brought documents to show the officers that Plaintiff was in violation of DHS (herein the "CITY") rules and requirements for staying in the shelter.

43. After reviewing the documents shown to them, the officers turned to Plaintiff and informed her that she was trespassing and needed to leave. Plaintiff then requested to speak to the officer's supervisor. Within a short period of time Lieutenant Fontaine arrived on the scene.

44. Upon LT. Fontaine arrival, he and Defendant Angela Mortimer entered her office to have a private discussion regarding why Plaintiff is trespassing. Defendant Angela Mortimer and Lt. Fontaine exited her office with approaching Plaintiff thereafter. Lt. Fontaine then informed Plaintiff that Defendant has shown his documentation that you are violating their rules and regulations and had to be removed from the premises. Plaintiff tried to google the proper procedure for DHS logout ("eviction) but Lt. Fontaine stated he need to see physical evidence of such procedure.

45. Plaintiff then called her son to inform him that they were trying to arrest her for trespassing, leading him to come downstairs to attempt to speak to Lt. Fontaine. Plaintiff stopped her son from speaking to the officers and informed him she would deal with this matter herself.

46. Plaintiff second son then came down as well to see what was going on.

47. Defendant Angela Mortimer and Lt. Fontaine then return to the office to have another private discussion. While they were in the office Plaintiff ask one of her two sons to contact Councilman Keith Powers office.

48. Once Councilman Keith Powers representative came to the phone, Plaintiff informed them that NYPD was in the shelter and attempting to arrest her for trespassing. While on the phone with the representative, Lt. Fontaine came out of Defendant Angela Mortimer's office and asked whom Plaintiff was on the phone with. Plaintiff responded that she was on the phone with Councilman Keith Powers office. Lt. Fontaine then got upset and told the other officers to arrest Plaintiff now after learning who she was on the phone with.

49. Plaintiff stated "NO" to being arrested and sat down on the floor in the corridor.

50. One of the officers demanded Plaintiff to get up. Out of fear of being charged with resisting arrest, Plaintiff followed the officer's demand to get up and then turned around so they could place the handcuffs on her wrist and removed her from the premises.

51. While being escorted to the squad car, Plaintiff asked her sons to go upstairs to gather their important belongings, Lt. Fontaine told them they were not allowed upstairs and needed to leave the premises as well.

52. After 1-2 minutes after Plaintiff being placed in the squad car, Lt. Fontaine opened the door on the side of that Plaintiff was sitting while looking at his phone to ask her a question. Lt. Fontaine asked Plaintiff "so you were arrested for this before?" Plaintiff replied "yes, this is why I'm telling you this is wrong, the ADA on the previous arrest declined to prosecute that arrest."

53. During the conversation with Lt. Fontaine, Plaintiff requested if he could adjust the handcuffs as it was really tight on her wrist, to which Lt. Fontaine responded, "it wasn't meant to feel good" and slammed the door in Plaintiff's face.

54. An NYPD officer, a social worker, and another staff member from Harmonia went upstairs to the two rooms Plaintiff and her children were residing in to make sure they were vacant.

55. Upon being escorted from the premises, Plaintiff's property/personal belongings such as clothes, devices (laptop, air pods), important documentation, identifications (ID's, birth certificate, passports, social security cards), wallets, credits cards, etc. still remain in the rooms.

56. After Plaintiff children were escorted off the premises, staff members of Harmonia would not allow her children to enter in order to collect their belongings. Plaintiff's children contacted the NYPD to request a police escort so that they could enter the premises to collect their belongings.

57. Plaintiff was taken to Midtown Precinct South located at 357 West 35th Street, New York, NY 10001. Plaintiff was held at the precinct inside a jail cell for 1-2 hours while still in her pajamas and slippers.

58. After 1-2 hours, Plaintiff was released from police custody.

59. Upon her release Plaintiff remained in front of the police precinct while she waited for her children to meet her, so that they were able to get a police escort to collect their belongings.

60. While waiting in for her children, an officer exited the precinct to try and give Plaintiff the Summons for her arrest. The Summons was thrown at Plaintiff by the officer.

61. Plaintiff's children left immediately after being escorted out of the shelter. They later After return back to the shelter with a police escort to try and collect their belongings.

62. Even with a police escort staff members refused to allow Plaintiff's children to enter the premises to collect their belongings but instead informed them that they will bring out their belongings. Staff members placed their belongings in garbage bags and brought some of them out through the service door in the bins used to take out trash. Their belongings were placed on the sidewalk next to other garbage bags (that also contains garbage). See **Exhibit "D"** of pictures taken of their belongings in garbage bags placed on the sidewalk by Harmonia staff members.

63. While still on the sidewalk, Plaintiff's children started looking through the garbage bags to collect a few changes of clothes as they could not carry everything by hand, since they had no way of transporting them or a place to stay. Plaintiff's children requested that Harmonia hold on to the remaining bags that they could not carry with them until they return to collect the rest.

64. On or about August 15, 2023, after placing some of their belongings in a family friend's storage unit, Plaintiff and her children return to PATH at about 11:00 P.M. Plaintiff spoke with a

worker and informed the worker about what occurred. PATH staff pulled up Plaintiff's case and informed her although her case shows that Harmonia logged her out, Plaintiff case was still active.

65. Upon learning that her case was still active, Plaintiff requested to speak to the legal department. The staff worker at PATH scheduled her an appointment to speak with legal as her case was still active.

66. On or about August 16, 2023, at approximately 8:00 A.M. after Plaintiff had checked in for her appointment to speak to an attorney from PATH Legal Department, she received a call from one of the attorneys working there advising her that her case was not active and for that reason he could not keep her scheduled appointment to speak to the legal department. Please note that Plaintiff's case was closed on August 17, 2023.

67. Upon learning that she was unable to speak to an attorney, she decided to leave PATH to seek help elsewhere.

68. On or about August 16, 2023, later in the afternoon after renting a U-Haul truck, Plaintiff and her children returned to Harmonia to collect the remaining bags.

69. Upon searching through the bags Plaintiff's children noticed some of their properties were missing. They placed their bags with their belongings in a family friend's storage unit. Plaintiff and her children then filed a police report for their missing property.

70. Plaintiff was traumatized from being arrested again as this was not the first time NYPD was weaponized against me (see **Exhibits "A"** and **"B"** for more details).

71. On or about August 21, 2023, Plaintiff requested a State Fair Hearing.

72. On or about August 28, 2023, Plaintiff filed an illegal lockout case in New York Civil Court. Some of her missing properties were returned after the Civil Court Order allowing her to return to Harmonia to retrieve her property (see **Exhibit "E"** for more details).

73. On or about September 25, 2023, Plaintiff filed a Claim with the Comptroller's Office. Claim No. 2023PI031331.

## DAMAGES/INJURIES

74. Plaintiff suffered and continues to suffer from public humiliation, embarrassment, shame, damage to reputation, duress, indignity, loss of liberty, deprivation of her constitutional rights, transitional homelessness, chronic homelessness and suffered emotional and mental distress.

## FIRST CAUSE OF ACTION
## 42 U.S.C. § 1983- Against Individual Defendants

75. Plaintiff repeats, reiterates, and realleges the above paragraphs as if they were fully set forth at length herein.

76. Plaintiff claims damages for the injuries set forth above against Defendants LT. DARRYL E. FONTAINE (Tax ID 937820), POLICE OFFICER RAWSAN A. JACKSON (Shield No. 26636), POLICE OFFICER KYLE M. LAGUARDIA (Shield No. 6801); POLICE OFFICER KELVIN VILLEGASALMAZO (Shield No. 7782), for violation of her constitutional rights under the color of law, in an amount to be determined by a jury after due trial.

## SECOND CAUSE OF ACTION
## 42 U.S.C. § 1983- Against the City and NYPD

77. Plaintiff repeats, reiterates, and realleges the above paragraphs as if they were fully set forth at length herein.

78. Before August 15, 2023, the City and NYPD developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons in New York City, which caused the violation of the Plaintiff's rights.

79. It was the policy and/or custom of the City and NYPD to inadequately and improperly investigate citizen complaints of misconduct.

80. It was the custom and policy of the City and NYPD to inadequately supervise, train, retain, and hire employees, including the named agencies and officers, thereby failing adequately to discourage further constitutional violations on the part of their employees.

81. Defendant CITY deprived Plaintiff of her property interest when they terminated her voucher after her false arrest and removal from Harmonia (S:US). Plaintiff was deprived of her property interest without notice or a chance to be heard.

82. Defendant the CITY actions in logging her out and closing her case, thus terminating her housing placement at Harmonia (S:US). This termination deprived Plaintiff of her right to shelter. It is a legal right providing that anyone in New York City without a place to live is guaranteed safe, decent, appropriate shelter. Defendant the CITY took actions against Plaintiff's case without giving her proper notice.

83. Defendant S:US deprived Plaintiff of her constitutional rights when they weaponized the NYPD to have her arrested and removed from her and her children off the premises.

84. As a result of the above-described policies and customs, employees of the City and NYPD, including the named Defendants, believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be sanctioned or investigated, but would be tolerated.

85. The above-described policies and customs demonstrated a deliberate indifference on the part of the policymakers of the City and NYPD to the constitutional rights of persons within the City and were the cause of the violations of Plaintiff's rights alleged herein.

86. Plaintiff claims damages for the injuries set forth above against the City and NYPD for violations of her constitutional rights under the color of law, in an amount to be determined by a jury after due trial.

**THIRD CAUSE OF ACTION**
**<u>42 U.S.C. § 1983- 4th and 14th Amendment, False Arrest</u>**

87. Plaintiff repeats, reiterates, and realleges the above paragraphs as if they were fully set forth at length herein.

88. The individual Defendants were working within the scope of their authority when they committed the actions described above, thereby falsely arrested, falsely imprisoned, confined, and detained Plaintiff without privilege.

89. The wrongful, unlawful arrest, seizure, apprehension, and detention of Plaintiff was without probable cause or privilege.

90. The individual Defendants were careless, reckless, and negligent in that they did have probable cause to arrest, apprehend, seized, and detained Plaintiff.

91. Throughout this period, Plaintiff was unlawfully and unjustifiably held under arrest, unreasonably seized, deprived of liberty, and falsely charged.

92. The individual Defendants named herein deliberately undertook these actions and their misconduct occurred without any fault or provocation from Plaintiff.

93. The individual named Defendants acted under the pretense and color of state law. Their actions were beyond the scope of their authority, intentionally depriving Plaintiff of her constitutional rights secured by the Fourth and Fourteenth Amendment.

94. As a result of the aforesaid misconduct, Plaintiff sustained injuries, including but not limited to emotional and psychological injuries.

95. As a result of the aforesaid arrest, seize, apprehend, detention, Plaintiff sustained personal injuries, along with public humiliation, embarrassment, shame, damage to reputation, indignity, loss of liberty, deprivation of her constitutional rights, and suffered emotional and mental distress, in the amount to be determined by a jury after due trial.

**FOURTH CAUSE OF ACTION**
**42 U.S.C. § 1983- 4th and 14th Amendment, Excessive Force**

96. Plaintiff repeats, reiterates, and realleges the above paragraphs as if they were fully set forth at length herein.

97. The individually named Defendants herein did not have probable cause to arrest, seize, apprehend, and/or detain Plaintiff.

98. The use of excessive force by the Officer Defendants, by amongst other things, seizing and tightly handcuffing her, constituted objectively unreasonable physical seizures of Plaintiff in violation of her rights under the Fourth and Fourteenth Amendments of the Constitution of the United States and to be free of a deprivation of liberty under the Fourteenth Amendment of the Constitution of the United States.

99. Officer Defendants were at all times agents, servants, and employees acting within the scope of their employment, and under the pretense and color of state law (City of New York and NYPD), which ae therefore responsible for their conduct.

100. As a result of the aforesaid misconduct, Plaintiff sustained injuries, including but not limited to emotional and psychological injuries.

101. As a result of the aforesaid arrest, seize, apprehend, detention, Plaintiff sustained personal injuries, along with public humiliation, embarrassment, shame, damage to reputation, indignity, loss of liberty, deprivation of her constitutional rights, and suffered emotional and mental distress, in the amount to be determined by a jury after due trial.

**FIFTH CAUSE OF ACTION**
**Negligent Hiring, Retention, Training and Supervision (Defendants the CITY and NYPD**

102. Plaintiff repeats, reiterates, and realleges the above paragraphs as if they were fully set forth at length herein.

103. Defendants owed a duty of care to Plaintiff.

104. Defendant City and its employees, servants and/or agents, acting within the scope of their employment, did negligently hire, retain, train, and supervise individual named Defendants.

105. Defendants individually named and NYPD breached their duty of care by acting among other things, seizing and tightly handcuffing Plaintiff. As a direct and proximate result of such acts, the Defendants deprived Plaintiff of her rights under the laws of the State of New York.

106. All of the foregoing occurred without any fault or provocation by Plaintiff.

107. Defendants were at all times agents, servants, and employees acting within the scope of their employment by the City and NYPD, which are therefore responsible for their conduct.

108. Defendant the City, as the employer of the Officer Defendants and other employees, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

109. As a result of the aforementioned conduct of the Defendants, Plaintiff sustained injuries, including but not limited to emotional and psychological injuries.

110. As a result of the aforementioned arrest, seize, apprehend, detention, Plaintiff sustained personal injuries, along with public humiliation, embarrassment, shame, damage to reputation, indignity, loss of liberty, deprivation of her constitutional rights, and suffered emotional and mental distress, in the amount to be determined by a jury after due trial.

**SIXTH CAUSE OF ACTION**
**Negligent Hiring, Retention, Training and Supervision (Defendants the Perry Perlmutter, S:US, Angela Mortimer, Lynn Gore)**

111. Plaintiff repeats, reiterates, and realleges the above paragraphs as if they were fully set forth at length herein.

112. Defendants owed a duty of care to Plaintiff.

113. Defendant S:US deprived Plaintiff of her liberty when they falsely had her arrested and removed off the Harmonia (S:US) premises.

114. Defendant Angela Mortimer and Lynn Gore's actions in logging her out and closing her case, thus terminating her housing placement at Harmonia (S:US), deprived Plaintiff of her right to shelter.

115. Defendants Lynn Gore and Angela Mortimer deprived Plaintiff of her constitutional rights when they weaponized Defendant NYPD to have her arrested and removed her and her children off the premises.

116. Defendants individually named, and S:US (Harmonia) breached their duty of care by acting among other things, making false statements to have Plaintiff arrested for trespassing. As a direct and proximate result of such acts, the Defendants deprived Plaintiff of her rights under the laws of the State of New York.

117. All of the foregoing occurred without any fault or provocation by Plaintiff.

118. As a result of the aforementioned conduct of the Defendants, Plaintiff sustained injuries, including but not limited to emotional and psychological injuries.

119. As a result of the aforementioned arrest, seize, apprehend, detention, Plaintiff sustained personal injuries, along with public humiliation, embarrassment, shame, damage to reputation, indignity, loss of liberty, deprivation of her constitutional rights, and suffered emotional and mental distress, in the amount to be determined by a jury after due trial.

**SEVENTH CAUSE OF ACTION**
**42 U.S.C. § 1983- 4th and 14th Amendment, Failure to Intervene (City and NYPD)**

120. Plaintiff repeats, reiterates, and realleges the above paragraphs as if they were fully set forth at length herein.

121. The individually named Defendants who did not physically touch Plaintiff, but were present when other officers violated Plaintiff's Constitutional Rights had an affirmative duty to intervene on behalf of Plaintiff, whose constitutional rights were being violated in their presence by other officers.

122. At no subsequent point did any of the individually named Defendants herein attempt to intervene and prevent the unlawful arrest, and use of excessive force against Plaintiff.

123. The individually named Defendants herein were present and witnessed other Defendants falsely arrest/unreasonably seize/detain and use excessive force against Plaintiff.

124. As a result of the foregoing, Plaintiff suffered personal injury, her liberty was restricted for an extended period, she was put in fear of her safety and was humiliated.

125. As a direct and proximate result of such acts, the Defendants deprived Plaintiff of her rights under the laws of the United States and the New York State.

126. The name Defendants were at all times agents, servants, and employees acting within the scope of their employment by the City and NYPD, which are therefore responsible for their conduct.

127. The City, as the employer of the Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

128. As a result of the aforesaid arrest, seize, apprehend, detention, Plaintiff sustained personal injuries, along with public humiliation, embarrassment, shame, damage to reputation, indignity, loss of liberty, deprivation of her constitutional rights, and suffered emotional and mental distress, in the amount to be determined by a jury after due trial.

**EIGHTH CAUSE OF ACTION**
**42 U.S.C. § 1983- 4th and 14th Amendment, Failure to Intervene (State of New York)**

129. Plaintiff repeats, reiterates, and realleges the above paragraphs as if they were fully set forth at length herein.

130. At no subsequent point did Defendant the State of New York herein attempt to intervene and/or prevent the denial/discontinuance of emergency shelter for Plaintiff and her children at a family-based shelter. Defendant's failure to intervene lead to Plaintiff and her family having to enter AFLIC (adult intake shelter), even though her children were under the age of 21 (the age required to enter AFLIC). Due to Defendant the State of New York failure to intervene, Plaintiff was placed in in one of Defendant Harmonia adult shelters.

131. At no subsequent point did Defendant the State of New York herein attempt to intervene and/or prevent the denial of Plaintiff's request to be place back in a family-based shelter with her children after her fair hearing (see **Exhibit "H"** for more details).

132. At no subsequent point did Defendant the State of New York herein attempt to intervene and/or prevent the logout by Defendant S:US (see **Exhibit "I"** for more details). Fair Hearing Case No. 8648248L.

133. As a result of the aforesaid failure to intervene, Plaintiff sustained personal injuries, along with being falsely arrested, and suffering emotional and mental distress in the amount to be determined by a jury after due trial.

**NINTH CAUSE OF ACTION**
**Defendants NYPD and Individually Named Officers Violation of Plaintiff's AC 8-802 Rights**

134. Plaintiff repeats, reiterates, and realleges the above paragraphs as if they were fully set forth at length herein.

135. The acts of individually named officers constituted conduct under the color of any law, ordinance, rule, regulation, custom, or usage.

136. The act of Defendants caused Plaintiff to be deprived of her rights under 2021 N.Y.C. Local Law No. 48 N.Y.C. Admin. Code §§ 8-802; to wit: to be secure in her person, house, papers, and effects against unreasonable seizures, and to be secure against the use of excessive force regardless of whether such force is used in connection with a seizure.

137. The Defendants while in uniform unlawfully seized Plaintiff, before detaining the Plaintiff, and further causing her detention.

**TENTH CAUSE OF ACTION**
**Defendants NYPD and Individually Named Officers Failure to Intervene in Violation of Plaintiff's AC 8-802 Rights**

138. Plaintiff repeats, reiterates, and realleges the above paragraphs as if they were fully set forth at length herein.

139. The acts of individually named officers constituted conduct under the color of any law, ordinance, rule, regulation, custom, or usage.

140. The act of Defendants caused Plaintiff to be deprived of her rights under 2021 N.Y.C. Local Law No. 48 N.Y.C. Admin. Code §§ 8-802; to wit: to be secure in her person, house, papers, and effects against unreasonable seizures, and to be secure against the use of excessive force regardless of whether such force is used in connection with a seizure.

141. Defendants that did not physically touch Plaintiff but were present when other officers violated Plaintiff's AC 8-802 right against unreasonable seizure and excessive force had an affirmative duty to intervene on behalf of Plaintiff, whose constitutional rights were being violated in their presence by other officers.

142. Defendants failed to intervene to prevent the unlawful conduct described herein, thereby failing in their duty to intervene to protect Plaintiff from violation of her rights.

143. As a result of the aforesaid arrest, seize, apprehend, detention, Plaintiff sustained personal injuries, along with public humiliation, embarrassment, shame, damage to reputation, indignity, loss of liberty, deprivation of her constitutional rights, and suffered emotional and mental distress, in the amount to be determined by a jury after due trial.

**ELEVENTH CAUSE OF ACTION**
**Defendant the City's Liability for Defendants Individually Named Officers'**
**<u>Violation of Plaintiff's AC 8-802 Rights</u>**

144. Plaintiff repeats, reiterates, and realleges the above paragraphs as if they were fully set forth at length herein.

145. Individually named Officers are "covered individuals" as defined in 2021 N.Y.C. Local Law No. 48 N.Y.C. Admin. Code §§ 8-801 in that they are employees of the Police Department or persons appointed by the Police Commissioner as a Special Patrolmen.

146. The City of New York, as the employer of the covered individual Defendant Officers', is liable to Plaintiff for the wrongdoing of the covered individual Defendant Officers.

147. The acts of individually named officers constituted conduct under the color of any law, ordinance, rule, regulation, custom, or usage.

148. The act of Defendants caused Plaintiff to be deprived of her rights under 2021 N.Y.C. Local Law No. 48 N.Y.C. Admin. Code §§ 8-802; to wit: to be secure in her person, house, papers, and effects against unreasonable seizures, and to be secure against the use of excessive force regardless of whether such force is used in connection with a seizure.

149. The Defendants while in uniform unlawfully seized Plaintiff, before detaining the Plaintiff, and further causing her detention.

150. As a result of the aforesaid arrest, seize, apprehend, detention, Plaintiff sustained personal injuries, along with public humiliation, embarrassment, shame, damage to reputation, indignity, loss of liberty, deprivation of her constitutional rights, and suffered emotional and mental distress, in the amount to be determined by a jury after due trial.

**TWELFTH CAUSE OF ACTION**
**Defendant the City's Liability for Defendants Individually Named Officers' Failure to Intervene in Violation of Plaintiff's AC 8-802 Rights**

151. Plaintiff repeats, reiterates, and realleges the above paragraphs as if they were fully set forth at length herein.

152. Individually named Officers are "covered individuals" as defined in 2021 N.Y.C. Local Law No. 48 N.Y.C. Admin. Code §§ 8-801 in that they are employees of the Police Department or persons appointed by the Police Commissioner as a Special Patrolmen.

153. The City of New York, as the employer of the covered individual Defendant Officers', is liable to Plaintiff for the wrongdoing of the covered individual Defendant Officers.

154. The acts of individually named officers constituted conduct under the color of any law, ordinance, rule, regulation, custom, or usage.

155. The act of Defendants caused Plaintiff to be deprived of her rights under 2021 N.Y.C. Local Law No. 48 N.Y.C. Admin. Code §§ 8-802; to wit: to be secure in her person, house, papers, and effects against unreasonable seizures, and to be secure against the use of excessive force regardless of whether such force is used in connection with a seizure.

156. Defendants that did not physically touch Plaintiff but were present when other officers violated Plaintiff's AC 8-802 right against unreasonable seizure and excessive force had an affirmative duty to intervene on behalf of Plaintiff, whose constitutional rights were violated in their presence by other officers.

157. As a result of the aforesaid arrest, seize, apprehend, detention, Plaintiff sustained personal injuries, along with public humiliation, embarrassment, shame, damage to reputation, indignity, loss of liberty, deprivation of her constitutional rights, and suffered emotional and mental distress, in the amount to be determined by a jury after due trial.

**THIRTEENTH CAUSE OF ACTION**
**<u>Violation of Article I § 12 of the New York State Constitution</u>**

158. Plaintiff repeats, reiterates, and realleges the above paragraphs as if they were fully set forth at length herein.

159. Such conduct breached the protections guaranteed to Plaintiff by the New York State Constitution, including but not limited to Article I §§ 11 and 12, and including the following rights:

i. freedom from unreasonable search and seizure of her person and property;

ii. from arrest without probable cause;

iii. freedom from false imprisonment, that being wrongfully detained without good faith reasonable suspicion, or legal justification;

iv. freedom from the lodging of false charges against her by police officers;

v. freedom from deprivation of liberty without due process of law.

160. As a direct and proximate result of the Defendants' deprivation of Plaintiff's rights, privileges guaranteed by the New York State Constitution, Plaintiff suffered emotional and psychological injuries, as well as deprivation of liberty.

161. As a result of the above tortious conduct, Plaintiff was caused to suffer emotional and psychological injuries, as well as deprivation of liberty.

162. As a result of the above unconstitutional conduct, the City is liable for the conduct of the Individual Defendants and any damages they caused under the doctrine of *respondeat superior*.

163. As a result of the aforesaid arrest, seize, apprehend, detention, Plaintiff sustained personal injuries, along with public humiliation, embarrassment, shame, damage to reputation, indignity, loss of liberty, deprivation of her constitutional rights, and suffered emotional and mental distress, in the amount to be determined by a jury after due trial.

**FOURTEENTH CAUSE OF ACTION**
**Negligent Infliction of Emotional Distress**

164. Plaintiff repeats, reiterates, and realleges the above paragraphs as if they were fully set forth at length herein.

165. The actions described herein, Defendants, each acting intentionally, recklessly and with utter disregard to the consequences of their actions and caused severe emotional distress to the Plaintiff.

166. Defendant multiple arrest and the shelters constant used of weaponizing the police caused Plaintiff to suffer emotional distress. Plaintiff experiences mood changes, sleep deprivation, lack of concentration, withdrawn from social activities/outings, stomachache and severe headaches.

167. The actions described herein, Defendants, each acting intentionally, recklessly and with utter disregard for the consequences of their actions and caused severe mental distress to the point that Plaintiff had to go to therapy to cope with the trauma. Plaintiff is traumatized by the multiple arrest and experience flashbacks of each arrests.

168. As a result of Defendants' intentional infliction of emotional distress, Plaintiff was caused to suffer personal injuries, violation of civil rights, public humiliation, embarrassment, shame, damage to reputation, indignity, loss of liberty, deprivation of her constitutional rights, and suffered emotional and mental distress.

**FIFTEENTH CAUSE OF ACTION**
**Transitional Homelessness**

169. As a result of Defendants' aforesaid actions of arresting Plaintiff and evicting her **(Exhibit "A")**, Plaintiff was caused to experience many years of homelessness, resulting to Plaintiff loss of permanent housing, and constantly denied permanent housing or means to receive permanent housing.

**SIXTEENTH CAUSE OF ACTION**
**Chronic Homelessness**

170. As a result of Defendants' aforesaid actions, Plaintiff and her family experience long-term homelessness for an extended amount of time. Plaintiff continuously had to start over the transitional housing process every time she was wrongfully arrested or wrongfully logged out ("evicted") from a shelter.

**SEVENTEENTH CAUSE OF ACTION**
**Duress**

171. As a result of Defendant Harmonia informing Plaintiff if she did not sign the Resident Contract, her and her family would not be able to reside there. Meaning she and her children would not have a place to stay or rest their head that night if she did not do so (**Exhibit "K"**).

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff requests that this Court:

a. Award compensatory damages to the Plaintiff against the Defendants, jointly and severally in an amount to be determined by a jury after due trial.

b. Award punitive damages in an amount to be determined by a jury after due trial.

c. Award such other and further relief as this Court deems just proper, and equitable.

Dated: New York, NY
July _____, 2025

MERCY WELLINGTON

State of New York
County of New York
Sworn to before me this
_____ day of JUL 0 9 2025

JUN SITU
NOTARY PUBLIC, STATE OF NEW YORK
REG. NO 04SI0038540
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES JUNE 17, 2029

**Exhibit A**

Date: October 27, 2015
Time: 10 AM
Location: Safe Horizon Rose House (126 West 127th Street, NY, NY 10027)

1. On or about 10AM on October 27th, police officers from the 28th Precinct walked into my apartment unit at the domestic shelter I have been residing in since 2014.

2. They informed me that I had to leave. I was afraid because where else were my children and I were going to reside, so I told the officers that my children and I had nowhere else to go.

3. The officers made the decision in order to remove me out of my unit they would arrest me for trespassing.

4. I informed the officers that I was not trespassing as a been a resident of Rose House for over a year now.

5. Officers still arrested me. They told me the rules of the shelters or different from the rules that would apply to a landlord-tenant matter.

6. I was taken out of the unit in handcuffs and brought to the precinct.

7. My children (ages 14, 13, 12) were not allowed were not allowed to enter the residence by employees at Rose House when they returned home from school.

8. Safe Horizon weaponized the NYPD to have me arrested for trespassing.

9. After I was arrested, the ADA refused to prosecute and questioned how they could arrest a domestic violence victim from a domestic violence shelter.

10. My children and I were not allowed to return to the shelter and went back to PATH (the homeless shelter intake center). I re-apply to stay at another shelter with my kids. We were placed in a DHS shelter run by WIN (Women In Need).

11. Because of the arrest and being removed from Safe Horizon I lost the Section 8 voucher I was given after my Civil Court case (Index No. 100664/15).

12. A Claim was filed in the Comptroller Office on January 8, 2016. Claim No. 2016PI002199.

13. Another claim was filed with the Comptroller Office on January 8, 2016, for Safe Horizon Rose House refusing to return my belongings that still remain in my unit since the day I was arrested in October 2015. Only after securing and Order to Show Cause I was allowed to obtain my properties. The claim number is 2016PI002206.

14. After losing my Section 8 Voucher I sued all agencies involved (my arrest, dismissal of voucher, etc.) but the case was dismissed.

15. When it was time for my sons to go to high school, I took advantage of the Lacrosse scholarship program at their school that gave them to go away to boarding school for high school. They return to stay with me and their sister (my daughter) on school breaks from school in the shelter.

16. My children were having a difficult time adjusting in the DHS shelter and it impacted them mentally. I was appreciative of DHS approving them going to boarding school and returning back to the shelter during school breaks.

17. While residing at WIN I requested a DHS case conference because I decided I no longer wanted anymore vouchers to be able to find a place for me and my children, so that we can leave the shelter.

18. Once I conference was granted, I informed the DHS representative that I did not want to get back on public assistance, and would prefer to continue working, save up my money to afford my own place when it is time to exit the shelter.

19. A DHS representative contacted WIN and informed them that I did not need an open Public Assistance case in order to reside there (WIN was harassing me to open back up my public assistance case in order for them to obtain payment for my children and I to reside there). They also informed them that I planned to leave the shelter when I saved enough money to get my own place for my children and me.

20. When COVID-19 happened, it derailed my plans.

21. I requested to apply for SOTA (Special One Time Program) to exit the shelter, but my income wouldn't allow us to apply.

22. In January 2022, I met with the new director of the WIN shelter to inform her that I plan to move out after my youngest child graduates.

23. On or about August 9, 2022, WIN maintenance went into the unit my family and I were staying in to fix a leak in the bathroom, but when I returned back to my unit, I noticed that that my undergarments were taken out of the dressers and thrown about all throughout the unit.

24. I filed a complaint, but it was never addressed. Instead, I received an administrative letter that stated that I was being transferred. The reason for the transfer was: (1) my children had aged out of the family shelter, (2) DHS needed the unit we were in for the migrants.

25. I requested a hearing, but I was informed that I could not have a hearing because it was an administrative transfer. I requested a State Fair Hearing to challenge the Transfer on or about August 15, 2022. The hearing was held via telephone with DHS waving its appearance. The judge quickly told me I could not challenge a DHS administration decision.

26. My family and I ended up going to AFLIC (adult intake) where three supervisors told me my sons were not allowed in an adult shelter because they were under 21.

27. We went back to PATH for placement but was placed in the adult shelter instead of a family shelter for children under 21.

28. On or about August 14, 2022, my family and I were transferred to Harmonia adult shelter run by Service for the Underserved (S:US). I met with my case worker and complied with what I was required to do, even though the shelter did not have a kitchen. Due to the lack of kitchen in the unit I was unable to prepare meals for my family, so much of my savings went into feeding my family.

29. I requested another State Fair Hearing on the matter to be transferred to a shelter for children under 21.

30. After the hearing, I went back to DHS Ombudsman's office and request an advocate on my behalf for a DHS case conference. The Ombudsman's office contacted S:US program director Angela Mortimer regarding the DHS case conference. Ms. Mortimer stated she would contact DHS regarding the case conference, but it was never scheduled.

**Exhibit B**

1. In 2011 I applied to Human Resource Administration (HRA) for assistance in paying my rent arrears after my roommate moved out and the economy was slow (causing me financial hardship).

2. HRA approved my family and I for a FHEPS voucher. My arrears were paid the landlord. A few months into the voucher FHEPS failed to pay its portion of the rent to the landlord.

3. October 2, 2012, I was evicted from my residence while all my children and I (along with my aunt who was residing with us) remained inside the residence.

4. My family and I moved into a motel room in Howard Beach while I was fighting the eviction in Queens Civil Court.

5. On October 28, 2012 (about 3 years before getting arrested by officers for trespassing at Rose House) hurricane Sandy hit the Queens area. During the hurricane a friend of mines requested if he could ride out the storm in the motel room that my children and I were staying at, which I permitted.

6. The motel room that we were staying in got flooded from the hurricane. My family and I (along with male friend) were evacuated and relocated to Queens College for shelter.

7. After the hurricane the Department of Housing Preservation and Development (HPD) granted families affected by hurricane Sandy a Section 8 voucher. However, HPD named my friend who was staying with us during the hurricane as the head of household on the Section 8 voucher they gave my family and me.

8. Even after informing them of the error HPD refused to fix the mistake.

9. With the voucher in hand, we found a place to stay and moved in. Shortly after moving in I learned my friend was abusing drugs and alcohol.

10. Again, I request HPD to fix the mistake of placing him as the head of household on my voucher because the constant domestic violence dispute frequently occurring in the household.

11. I was afraid for my children if things were to get more severe than they already were.

12. HPD informed me there is nothing they could do because he was the head of household, even after making a complaint about the domestic violence dispute happening in the home.

13. HPD failed took take into consideration Title VI of the Violence Against Women Reauthorization Act of 2013 when I informed them the domestic violence taking place in my household. In 2013, Congress reauthorized the Violence Against Women Act (hereinafter "VAWA") recognizing the survivors of domestic violence often face housing discrimination and risk of homelessness when seeking to leave abusive situations.

14. After filing my complaints with HPD, and them refusing to bifurcate the Section 8 voucher, the domestic violence dispute only got worse as time passed. During the last domestic violence incident the police were called, I was arrested and charged with being the primary aggressor (even though both of us have sustained bruises and his bruises were from self-defense).

15. HPD failed to take into consideration Part M of VAWA which allows housing agencies to bifurcate a lease (or voucher) in order to evict any individual who engaged in criminal activity relating to domestic violence without terminating assistance to a victim of such criminal activity.

16. An order of protection was placed against me to stay away from my home. This order would have kept me away from my children who would be residing with a man they had no relation to this man.

17. In January 2014, I contacted Queens Legal Service (hereinafter "QLS") seeking assistance in bifurcating the Section 8 voucher. I received counseling and services of domestic violence. The Jana Morace, the Director of Social Work at QLS provided HPD with documentation attesting to

her professional belief that I was in fact a victim of domestic violence by my male friend and had been wrongly excluded from my home.

18. In November 2014, my children and I were placed in a domestic violence shelter by HRA. We were placed in Safe Horizon Rose for safety.

19. While in the shelter I was referred to Queens Legal Service regarding my housing matter with HPD. I did an Article 78 demanding HPD bifurcate my Section 8 voucher. This matter was filed in New York Supreme Court located at 60 Centre Street, Index No. 100664/15.

20. I submitted with the Article 78 motion documents to show the male friend has no relation to my children (at time who were minors), along with proof proving that I was a victim of domestic violence.

21. While that case was pending, in July 2015, the domestic violence criminal court case against me in Queens Court was dismissed. The records were sealed due to this matter being a speedy trial motion.

22. In October 2015 HPD granted me a new Section 8 voucher as relief for the Article 78 lawsuit filed against them. Even though I was granted a new Section 8 voucher, HPD was biased in decision in giving me and my 3 minor children at the time, a two-bedroom voucher. Whereas my abuser was still permitted to reside in the 3-bedroom apartment I was excluded from.

23. Though I protested against the two-bedroom apartment but I accepted as I wanted to get my children and I out of the shelter that we have been residing in for over a year. After residing there for over a year the HRA personnel started asking questions pertaining to my HPD matter. Staff members at Safe Horizon Rose House started advising me that families are only allowed to reside in there for only a year.

24. HPD eventually offered me an apartment, and after filing out the necessary paperwork I requested to view the apartment. But I was informed by Building management that it was in their policy that I was not able to view the apartment without first signing the lease.

25. Building Management failed to take into consideration Title VIII of the Civil Rights Act 1968, as amended by the Fair Housing Amendments Act of 1998. 42 U.S.C. § 3601 et seq. states that "it shall be unlawful … [t]o refuse to sell or rent after the making bona fide offer, or to refuse negotiate for the sale or rental of a dwelling to any person because of … sex". Failure to allow me to view the apartment before signing a lease is unlawful under the Fair Housing Act.

26. I informed HPD and Sage Horizon Rose House about the building management's policy, and neither agency advocated on my behalf to view the apartment before signing a lease.

27. After I refused to sign the lease since I was unable to view the apartment, Safe Horizon Rose House gave me 48 hours to vacate the shelter.

**Exhibit C**

**Fwd: ILP review**

Mercy Wellington
Nyah Wilson
Fri, Sep 1, 2023, 8:57 AM

---------- Forwarded message ---------
From: **Mercy Wellington** <mercywellington@gmail.com>
Date: Thu, Aug 31, 2023 at 7:09 PM
Subject: Fwd: ILP review
To: <nyah.wilson12@gmail.com>

---------- Forwarded message ---------
From: **Mercy Wellington** <mercywellington@gmail.com>
Date: Mon, Aug 14, 2023 at 12:53 PM
Subject: Fwd: ILP review
To: <nyah.wilson12@gmail.com>

---------- Forwarded message ---------
From: **Dieunane Cadet** <DCadet@sus.org>
Date: Wed, Aug 9, 2023 at 12:12 PM
Subject: RE: ILP review
To: Mercy Wellington <mercywellington@gmail.com>

No, but she requested for updates today.

impacted by homelessness, poverty, and disability. Check out the event live gathering on Facebook or Instagram.

**From:** Dieunane Cadet <[illegible]>
**Sent:** Wednesday, May 31, 2023 10:03 AM
**To:** Mercy Wellington <[illegible]>
**Cc:** Jaquatta Cooper <[illegible]>
**Subject:** ILP Review

Good morning Ms. Wellington,

How are you? You were scheduled for ILP review today @10am, will you still be attending or do you still wish to stay non-compliant until you get a case conference with DHS?

Thanks!

[illegible]

[illegible]

[illegible]

S:

Services for the Underserved, Inc.

*"Opportunity for All"*

S:US is hosting Dinner for A Better New York on June 7 to help New Yorkers impacted by homelessness, poverty, and disability. Check out the event live gathering on Facebook or Instagram.

Disclaimer

This message is intended for the exclusive use of the recipient(s) named above and may contain information that is privileged and confidential. If you are not an intended recipient, you are hereby notified that any disclosure, dissemination, distribution or copying of this communication or its contents is strictly prohibited. If you have received this communication in error, please delete this message and any attachments and notify me immediately by replying to this message. Thank you.

**S:**
**Services for the Underserved, Inc.**
*"Opportunity for All"*

S:US is one of the largest veterans' services providers in New York City.
Read how we are supporting veterans and join the fight to end veteran homelessness.

**From:** Mercy Wellington <mercywellington@gmail.com>
**Sent:** Wednesday, August 9, 2023 11:53 AM
**To:** Dieunane Cadet <DCadet@sus.org>
**Subject:** Re: ILP review

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Ms. Cadet. Nothings changed. Have you heard anything from Ms.Mortimer regarding my reques for a DHS case conference?

On Wed, Aug 9, 2023 at 10:42 AM Dieunane Cadet <DCadet@sus.org> wrote:

Good morning Ms. Wellington,

[illegible]

Nyah Wilson
Fri, Sep 1, 2023, 8:47 AM

---------- Forwarded message ---------
From: **Mercy Wellington** <mercywellington@gmail.com>
Date: Wed, May 31, 2023 at 11:53 AM
Subject: Re: ILP Review
To: Jaquatta Cooper <JCooper@sus.org>
CC: Angela Mortimer <AMortimer@sus.org>, Dieunane Cadet <dcadet@sus.org>

Sorry, I won't be able to attend. Waiting for DHS case conference.

On Wed, May 31, 2023 at 11:02 AM Jaquatta Cooper <JCooper@sus.org> wrote:

Good Morning Ms. Wellington

You have not complied with any ILP meetings as well as signing the nightly roster. It appears as if your still waiting on a meeting with DHS. If possible can we meet at the shelter level to see how we can assist you outside of waiting on DHS. Please let us a know a good day and time to meet. In addition to, let us know how we can assist your family throughout this process.

[illegible]

[illegible]

[illegible]

**S:**
**Services for the Underserved, Inc.**
*"Opportunity for All"*

SUS is hosting Dinner for A Better New York on June 7 to help New Yorkers

Nyah Wilson
Fri, Sep 1, 2023, 8:46 AM

---------- Forwarded message ---------
From: **Jaquatta Cooper** <JCooper@sus.org>
Date: Wed, May 17, 2023 at 9:52 AM
Subject: RE: ILP review
To: Dieunane Cadet <DCadet@sus.org>, Mercy Wellington <mercywellington@gmail.com>

Good Morning Ms. Wellington

You have not complied with any ILP meetings as well as signing the nightly roster. It appears as if your still waiting on a meeting with DHS. If possible can we meet at the shelter level to see how we can assist you outside of waiting on DHS.

[illegible]

[illegible]

**Services for the Underserved, Inc.**
*"Opportunity for All"*

Read S:US' [illegible] white paper and get involved in the food justice movement to confront food insecurity in a unified, collaborative approach.

**From:** Dieunane Cadet <DCadet@sus.org>
**Sent:** Wednesday, May 17, 2023 9:44 AM
**To:** Mercy Wellington <mercywellington@gmail.com>
**Cc:** Jaquatta Cooper <JCooper@sus.org>

**Subject:** ILP review

Good morning Ms. Wellington,

How are you? You were scheduled for ILP review today, will you still be attending or do you still wish to stay non-compliant until you get a case conference with DHS?

Thanks!

[illegible]

[illegible]

[illegible]

**Services for the Underserved, Inc.**

*"Opportunity for All"*

Read S:US' Uniting on Food Justice white paper and get involved in the food justice movement to confront food insecurity in a unified, collaborative approach.

Disclaimer

This message is intended for the exclusive use of the recipient(s) named above and may contain information that is privileged and confidential. If you are not an intended recipient, you are hereby notified that any disclosure, dissemination, distribution or copying of this communication or its contents is strictly prohibited. If you have received this communication in error, please delete this message and any attachments and notify me immediately by replying to this message. Thank you

Nyah Wilson
Fri, Sep 1, 2023, 8:36 AM

---------- Forwarded message ---------
From: **Mercy Wellington** <mercywellington@gmail.com>
Date: Fri, Dec 23, 2022 at 11:46 AM
Subject: Re: ILP REVIEW
To: Dieunane Cadet <dcadet@sus.org>

Yes, I am still waiting on that case DHS case conference.

On Fri, Dec 23, 2022 at 11:04 AM Dieunane Cadet <DCadet@sus.org> wrote:

Good morning Ms. Wellington,

How are you? You ARE scheduled for ILP review today @12pm, will you be attending or do you still wish to stay non-compliant until you get a case conference with DHS?

Thanks!

[illegible]

[illegible]

[illegible]

**Services for the Underserved, Inc.**
*"Opportunity for All"*

**Exhibit D**











**Exhibit E**

A

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: HOUSING PART R
-------------------------------------------------------------- X
MERCY WELLINGTON,

Petitioner,

Index No. 10175/2023

- against -

**DECISION/ORDER**

SERVICES FOR THE UNDERSERVED,

Respondent.
-------------------------------------------------------------- X

Present: Hon. Jack Stoller
Judge, Housing Court

The Court adjourns this case to September 1, 2023 at 11:00 a.m. All stays remain in effect. The parties are to appear in part R, Room 851 of the Courthouse located at 111 Centre Street, New York, New York.

It appears from a conference with the parties the fact disputes are limited. Both sides agree that the premises is a shelter; that Petitioner at one point was living in the shelter with her two minor children; that Respondent took the position that Petitioner was not abiding by the rules of the shelter, which Petitioner disputed; and that Respondent took action to prevent Respondent from returning to the premises. The question of whether this conduct on Respondent's part amounts to a lockout cause of action appears to turn on a question of law rather than a question of fact. Petitioner further alleges that the subject premises was a space that she could close the door to and exclude others from. The purpose of this adjournment is for both parties to bring information to the Court, particularly about the program according to which Respondent sheltered Petitioner: how it is funded, how it operates and receives referrals, and what, if anything, Petitioner had to sign upon entry to the premises.

The Court directs Respondent to provide Petitioner with limited, supervised access to the subject premises on August 30, 2023 from 12 noon to 2 p.m. for the purposes of permitting Petitioner to retrieve her personal property as needed.

This constitutes the decision and order of the Court.

Dated: New York, New York
August 28, 2023

HON. JACK STOLLER
J.H.C.

APPROVED
JSTOLLER, 8/28/2023, 4:26:13 PM

**Exhibit F**

**Lynn Gore**

**From:** Morad, Jameel <jmorad@dhs.nyc.gov>
**Sent:** Thursday, August 10, 2023 3:34 PM
**To:** Lynn Gore; Thomas, Doreen; Barrow, Keisha; Oni, Rotimi; Gentles-Mills, Patricia; VacancyControl,; Vazquez, Nelly
**Cc:** HS-Harmonia; Craig OConnor; Garcia, Desiret
**Subject:** Re: [EXTERNAL] HARMONIA LOGOUTS

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Done.

**Jameel Morad, MSW | Manager, Special Projects**
**Administrative Director of Social Services**
Portfolio Planning & Development - HERO & Systems
33 Beaver Street - 15th Floor - NY, NY 10004
Phone: 212-361-6397 C: 646-983-0511
jmorad@DHS.NYC.GOV / NYC.gov/dss

NYC Department of Homeless Services
Department of Social Services

*Serving New Yorkers with Care and Compassion*

**From:** Lynn Gore <LGore@sus.org>
**Sent:** Thursday, August 10, 2023 3:29 PM
**To:** Thomas, Doreen <DTHOMAS@dhs.nyc.gov>; Morad, Jameel <jmorad@dhs.nyc.gov>; Barrow, Keisha <KBARROW@dhs.nyc.gov>; Oni, Rotimi <RONI@dhs.nyc.gov>; Gentles-Mills, Patricia <PGMILLS@dhs.nyc.gov>; VacancyControl, <VacancyControl@dhs.nyc.gov>; Vazquez, Nelly <NVAZQUEZ@dhs.nyc.gov>
**Cc:** HS-Harmonia <HS-Harmonia@sus.org>; Craig OConnor <CROCONNOR@dhs.nyc.gov>; Garcia, Desiret <DESIRETG@dhs.nyc.gov>
**Subject:** [EXTERNAL] HARMONIA LOGOUTS

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Use the Phish Alert Report button to report this email or forward suspected email to phish@hra.nyc.gov as an attachment.

Please log out the following families:

BED SIZE: 2 Twin Beds
DATE AND TIME ROOM WILL BE READY FOR NEXT OCCUPANT: 8/12/2023

FACILITY/FACILITY CODE: Harmonia/FM57
CLIENT NAME: **Mercy Wellington**
CASE NUMBER: **9314731**
EFFECTIVE DATE: 8/10/23
EXIT TYPE: 48-Hour Curfew Violation
ROOM NUMBERS: **533A & 533B**
BED SIZE: 2 Twin Beds in each room = 4 Twin Beds
DATE AND TIME ROOMS WILL BE READY FOR NEXT OCCUPANT: 8/14/2023

Thank you,

Lynn Gore
Pronouns: She/Her/Hers
Administrative Assistant
12 East 31st Street | New York, NY 10016
O: 646.973.1331 Ext. 1741 | F: 718.993.1691
LGore@sus.org | sus.org

S:US
Services for the Underserved, Inc.
*"Opportunity for All"*

S:US is one of the largest veterans' services providers in New York City.
**Read** how we are supporting veterans and join the fight to end veteran homelessness.

Disclaimer
This message is intended for the exclusive use of the recipient(s) named above and may contain information that is privileged and confidential. If you are not an intended recipient, you are hereby notified that any disclosure, dissemination, distribution or copying of this communication or its contents is strictly prohibited. If you have received this communication in error, please delete this message and any attachments and notify me immediately by replying to this message. Thank you.

**Exhibit G**

# Gmail - Harmonia logout

Gmail                                                                 Mercy Wellington <mercywellington@gmail.com>

**Harmonia logout**

**Vazquez, Nelly** <NVAZQUEZ@dhs.nyc.gov>                                                                 Mon, Aug 14, 2023 at 2:28 PM
To: Mercy Wellington <mercywellington@gmail.com>

you need to go back to aflc you are log out

**From:** Mercy Wellington <mercywellington@gmail.com>
**Sent:** Monday, August 14, 2023 13:51
**To:** Vazquez, Nelly <NVAZQUEZ@dhs.nyc.gov>
**Subject:** [EXTERNAL] Harmonia logout

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Use the Phish Alert Report button to report this email or forward suspected email to phish@hra.nyc.gov as an attachment.

Hello Mr. Vazquez,your decision to log me out of Harmonia is invalid. You have been misinformed by Harmonia's staff.
I have been a residence since August of 2022. I asked for a DHS case conference in October regarding a some issues I've had here. Till this date, I have not received been Granted that request. I have been in the building every night since I was transfer here. I was told that I was logged out by Jameel Morad on Friday, this was false. I
Want to PATH, I was told I was not logged out.
Please advise me as to what is going on.
Please provide me with documentation including your signature for this log out

Thank you
Mercy Wellington

**From:** Mercy Wellington
<mercywellington@gmail.com>
**Sent:** Monday, August 14, 2023 13:51
**To:** Vazquez, Nelly <NVAZQUEZ@dhs.nyc.gov>
**Subject:** [EXTERNAL] Harmonia logout

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Use the Phish Alert Report button to report this email or forward suspected email to phish@hra.nyc.gov as an attachment.

...

VIEW ENTIRE MESSAGE



me Aug 15, 2023
to Nelly

Good morning Nelly, thank you for taking the time out to respond to my email.
Please provide me with proper documentation as is provided by DSS rules and regulations regarding, "logout."
Secondly, I don't know whether you noticed that my case number is not one of AFIC, but rather, PATH.
Why didn't you attempt to find out why that is before you agreed to do this fraudulent " logout.
I am in possession of the email you sent to Lynn Gore. I will be forwarding it to my advocate.

Thank you.

...

**Exhibit H**

STATE OF NEW YORK
OFFICE OF TEMPORARY AND DISABILITY ASSISTANCE

REQUEST: December 22, 2022
CASE #:
CENTER #: DHS
FH #: 8544379P

In the Matter of the Appeal of

Mercy Wellington

from a determination by the New York City Department of Homeless Services

DECISION AFTER FAIR HEARING

**JURISDICTION**

Pursuant to Section 22 of the New York State Social Services Law (hereinafter Social Services Law) and Part 358 of Title 18 NYCRR (hereinafter Regulations), a fair hearing was held on February 13, 2023, in New York City, before Alexander Bunaev, Administrative Law Judge. The following persons appeared at the hearing:

For the Appellant

Mercy Wellington, Appellant (by speakerphone)

For the Social Services Agency

Agency appearance waived by the Office of Administrative Hearings

**ISSUE**

Was the Agency's determination regarding the conditions of the Appellant's Temporary Housing Assistance placement correct?

**FACT FINDING**

An opportunity to be heard having been afforded to all interested parties and evidence having been taken and due deliberation having been had, it is hereby found that:

1. The Appellant's household is in receipt of Temporary Housing Assistance.

2. On December 22, 2022, this hearing was requested.

**APPLICABLE LAW**

An applicant or recipient has the right to challenge certain determinations or actions of a social services agency or such agency's failure to act with reasonable promptness or within the time periods required by other provisions of this Title, by requesting that the Department provide a fair hearing. An applicant or recipient does not have the right to a fair hearing in all situations. 18 NYCRR 358-3.1(a), (f).

Administrative Directive 94 ADM-20, dated December 29, 1994, provides that homeless persons do not have the right to choose their own temporary placements.

**DISCUSSION**

On December 22, 2022, this hearing was requested by the Appellant to challenge the conditions of the Appellant's Temporary Housing Assistance. The Appellant claimed that she cannot cook at the facility and her children are being harassed. Other than that there is no right for a person to choose their placement, even if all of the Appellant's allegations regarding the conditions of the Temporary Assistance Housing placement were accepted as accurate, there is no right to a hearing to challenge the conditions of a Temporary Housing Assistance placement, so that there is no issue to be decided, and no relief to grant the Appellant. The Appellant has other remedies, of which she may avail herself, and which she may pursue.

**DECISION**

Regarding the Agency's determination regarding the conditions of the Appellant's Temporary Housing Assistance, there is no issue to be decided.

DATED: Albany, New York
02/14/2023

NEW YORK STATE OFFICE OF
TEMPORARY AND DISABILITY ASSISTANCE

By

Commissioner's Designee

**Exhibit I**

STATE OF NEW YORK
OFFICE OF TEMPORARY AND DISABILITY ASSISTANCE

REQUEST: August 21, 2023
[redacted]
AGENCY: DHS
FH #: 8648248L

In the Matter of the Appeal of

[redacted]

from a determination by the New York City Department of Social Services

**DECISION AFTER FAIR HEARING**

**JURISDICTION**

Pursuant to Section 22 of the New York State Social Services Law (hereinafter Social Services Law) and Part 358 of Title 18 NYCRR, (hereinafter Regulations), a fair hearing was held on August 23, 2023, in New York City, before an Administrative Law Judge. The following persons appeared at the hearing:

For the Appellant

[redacted]

For the Social Services Agency

Agency appearance waived by the Office of Administrative Hearings

**ISSUE**

Was the Agency's determination to discontinue the Appellant's Temporary Housing Assistance, correct?

**FACT FINDING**

An opportunity to be heard having been afforded to all interested parties and evidence having been taken and due deliberation having been had, it is hereby found that:

1. The Appellant, who is 54, has been in receipt of Temporary Housing Assistance with her three children ages 22, 21 and 20.

2. On August 21, 2023, this hearing was requested.

**APPLICABLE LAW**

An applicant or recipient has the right to challenge certain determinations or actions of a social services agency or such agency's failure to act with reasonable promptness or within the time periods required by other provisions of this Title, by requesting that the Department provide a fair hearing. An applicant or recipient does not have the right to a fair hearing in all situations. 18 NYCRR 358-3.1(a), (f).

**DISCUSSION**

The record establishes that the Appellant was logged out of the shelter for a 48 hour curfew violation and exited the shelter on August 14, 2023. The Appellant stated that she has been staying with a friend. The Appellant has not reapplied for Temporary Housing Assistance. The Appellant's recourse is to reapply if she still needs assistance. Therefore, there is no issue to be decided, and no relief to grant the Appellant.

**DECISION**

There is no issue to be decided.

DATED: Albany, New York
09/01/2023

NEW YORK STATE OFFICE OF
TEMPORARY AND DISABILITY ASSISTANCE

By

Commissioner's Designee

**Exhibit J**

[illegible]

Please log out the following family

FACILITY/FACILITY CODE: Harmonia/FM57
CLIENT NAME: Marty Wellington
CASE NUMBER: 9916735
EFFECTIVE DATE: 8/14/23
EXIT TYPE: 48-Hour Curfew Violation
ROOM NUMBERS: 539A & 539B
BED SIZE: 2 Twin Beds in each room = 4 Twin Beds
DATE AND TIME ROOMS WILL BE READY FOR NEXT OCCUPANT: 8/16/2023

Thank you.

**Exhibit K**

1. On October 27, 2015, my family and I were transferred by PATH to Women In Need (WIN).
2. My family and I resided at Women In Need (WIN) from October 2015 to August 2022.
3. Women In Need (WIN) did an administrative transfer due to filing a complaint about a maintenance staff entering my unit without my knowledge or consent. My personal belongings were thrown about throughout the unit and failing to leave a notice about why they were inside my unit.
4. I complained to the Director of the shelter (Ms. Clarke) about what occurred, and instead of doing an investigation regarding my complaint, she decided to do an administrative transfer.
5. I requested a hearing but was informed that I was not entitled to one due to the transfer coming directly from DHS administration.
6. I contacted Melissa Ramos from DHS who informed me that the supervisory review was completed in regard to the transfer that the Director of the shelter requested.
7. I was not aware of what was told to Ms. Ramos regarding my complaint, all I know is that I filed a complaint and then the next minute I was told I was being transferred.
8. I received a courtesy copy of the transfer form prepared by Melissa Ramos. On those documents it stated that the reason for the transfer was 1) my children had aged out of being in a PATH family shelter, and 2) DHS needed to provide migrant families with a place to stay since my family no longer qualified to stay there.
9. I requested a fair hearing to put a stop to such a transfer. During the hearing someone impersonated a judge who did not follow proper Fair Hearing procedures. The judge impersonator informed me that my family and I needed to leave the shelter, and that this

hearing was unnecessary because it was an administrative transfer. I was told there was nothing I could do to prevent such a transfer.

10. After leaving the state fair hearing, I went to AFIC (Adult Family Intake Center).
11. At AFIC I was informed by two supervisors that I could only bring my daughter (21 at the time), but not my two sons because they were still underage (20, 19 at the time). One has to be 21 years old to be able to enter an adult shelter.
12. I went back to WIN to let them know that my family and I could not go through the adult shelter due to my sons being underage at that time. WIN informed me that they will contact the adult shelter themselves.
13. WIN later told me after they spoke with the adult shelter that it was okay for my children and I to go into the shelter.
14. Before I could enter the adult shelter, I had to return to AFIC to get a referral to enter HARMONIA.
15. At AFIC, three supervisors came down to meet with me. They told me that they could not allow my 19-year-old and 20-year-old sons into the adult shelter and advised me to return back to PATH.
16. At PATH, I was told I would be allowed int the adult shelter, but at that time the room was not ready for occupancy due to lack of running hot water.
17. I returned to WIN and informed them what I was told by PATH, to which they respond that my family and I still need to leave.
18. Because of that I went to OMBUDSMAN seeking help with this matter, as my children and I had nowhere to stay.

19. At the OMBUDSMAN office I met Sarah Hailer. Sarah Hailer informed me to return to Jenny Clark (WIN) for the next few days until transport can be arranged to take my children and I to Harmonia.

20. Before transport could be arranged, at Jenny Clark my children were getting harassed by the security guards. My daughter called me in a panic to inform her that they (security staff) were constantly banging on the unit door. When she opened the door, one of the guards kept poking my daughter in the middle of her forehead and stating that she and her mother needed to vacate the unit at this very moment.

21. Out of fear for my children and I safety, I rented a van and packed up as much of our belongings (most were thrown in the garbage) as well as cleaned up the unit before we left WIN's premises.

22. After leaving WIN's premises, we arrived at Harmonia. At Harmonia under duress my children and I were forced to sign a contract to allow my underage sons to be able to reside there.

23. Under duress we signed the contract in order to have a place to rest our heads for the night, hoping to speak to the Director (Angela Mortimer) of the shelter in the morning.

8:50 5G

< Voicemail

**+1 (212) 361-6547**
New York, NY
August 15, 2022 at 6:10 PM

0:00 -0:37

**Transcription**

"Good day this is Sarah Hailer me a buzz been office this is a message from Mercy Wellington please note we spoke earlier today if you if you like the office regarding your health replacement on this has been cleared up please return to Jenny Clark for the next few days transport will be arranged most likely late there's a wet Thursday however anytime between Wednesday and Friday sure you should expect it scheduled I will try to or not number we have for you as well thank you bye..."

Was this transcription useful or not useful?

Favorites Recents Contacts Keypad Voicemail

8:55

Voicemail

**Transcription (low confidence)**

"Good afternoon this call is from Mercy about 910 in reference to a complaint that was filed my name is Miss Lionel I received a response from is Clark with the program director at the limit and she stated that you were so I have to transfer papers on 814 tax which ought to an 815 transportation was provided for your facility however the climb if you thought transportation that's going to 10 complained of new location I haven't had a program director called to your phone because I have five complain I was informed by security at no site order with someone and the client had two rooms assigned to her and awaiting our arrival the also stated you departed difference a Libby on 817 at 5:32 PM for you all transportation um if you have any other issues or concerns feel free to contact them back in the hotline to find another complaint thank you and have a good day..."

Favorites Recents Contacts Keypad Voicemail

8:51

< Voicemail

**+1 (212) 361-7416**
New York, NY
August 15, 2022 at 11:40 AM

0:00 -0:29

**Transcription**

"Hello good morning my name is Melissa Ramos um put in a minute straighter with the um um calling you to let you know that the um transfer of it was over at the supervisory review was completed um if you would like to continue or you have further questions please give me a call back at 212-361-7416 thank you..."

Was this transcription useful or not useful?

Favorites Recents Contacts Keypad Voicemail